UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**Pamela Ross,**

**Plaintiff,**

**-v-**                                                          **6:09-CV-1158 (NAM/DEP)**

**Verizon Communications, Inc. and Verizon Pension
Plan for New York and New England Associates,**

**Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Joseph Hein, Esq.
6468 French's Hollow Road
Altamont, New York 12009-9404
Attorney for Plaintiff

Duane Morris LLP
Eve I. Klein, Esq., of counsel
1540 Broadway
New York, New York 10036
and
Duane Morris LLP
James P. Hollihan, Esq., of counsel
600 Grant Street
Suite 5010
Pittsburgh, Pennsylvania 15219
Attorneys for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§1001, et seq., plaintiff claims that defendant unlawfully denied her application for a disability

pension.  As a result of her employment with Verizon Communications, Inc., plaintiff participated

in the Verizon Pension Plan for New York and New England Associates ("Pension Plan"), a

qualifying plan under ERISA.  In her amended complaint (Dkt. No. 8), she seeks judgment declaring that the denial violates ERISA and directing approval of her application and payment of retroactive benefits under the Pension Plan.  Plaintiff moves (Dkt. No. 19) for summary judgment. Defendant cross-moves (Dkt. No. 24) for summary judgment.  Plaintiff's claims against defendant Verizon Communications, Inc. were dismissed by stipulation (Dkt. No. 18).

As discussed below, plaintiff's motion for summary judgment is granted and defendant's cross motion for summary judgment is denied.  Defendant is directed to approve plaintiff's application and to pay retroactive benefits under the Pension Plan.

### BACKGROUND[1]

The amended complaint (Dkt. No. 8) claims as follows:

> Plaintiff Pamela Ross was employed by the defendant Verizon as a Customer Service Administrator from 1989 until 2006.
>
> Ms. Ross suffers from chronic degenerative disc disease. As a result she is unable to sit or stand when her condition is acute. Even when not acute she is advised by her doctors to avoid sitting, standing, and flexion of the back to avoid an acute pain condition. Her condition is considered permanent and progressive and she eventually was unable to perform her job or any job at her place of employment.
>
> She was required by her employer to file for Social Security Disability which was approved in December 2006.
>
> Following this approval, in December 2006 Ms. Ross applied for a Disability Pension Benefits from her employer pursuant to the Verizon Pension Plan for New York and New England Associates.
>
> This application was disapproved by the defendant Verizon and Ms. Ross appealed that decision in July 2007.

---

[1]
The facts are drawn from the parties' Statements of Material Facts, supported by the record, and are undisputed unless otherwise indicated.

By letter of October 1, 2007, the defendant Verizon advised Ms. Ross that it had denied her appeal.

The denial was without any factual basis and contrary to the evidence before it, replete with errors, and not the result of a deliberate, principled reasoning process, and constitutes an erroneous benefit determination.

The defendants acted under an inherent conflict of interest in that the decision to deny Ms. Ross' disability pension favorably impacted its financial interests.

(Paragraph numbering omitted.)  Plaintiff seeks judgment declaring that defendant's conduct violates ERISA and directing defendant to approve her application and pay retroactive benefits.

The requirements for a disability pension, Article 4, Section 4.3 of the Pension Plan, provide:

4.3 Disability Pension.

(a) Eligibility. A Participant shall be eligible for a Disability Pension if he or she becomes totally disabled as result of sickness or injury, other than an accidental injury arising out of and in the course of employment with a Participating Company.
***
(b) Totally Disabled. For purposes of this section, a Participant is considered to be totally disabled for any period during which, by virtue of a disability, he or she is unable to perform any job for the Company or an Affiliate which is offered to the Participant by the Participating Company for which the Participant most recently provided services.

Under the Pension Plan, the claims and appeals administrators are vested with authority to construe the terms of the Pension Plan, make factual findings, and determine benefit eligibility. The Pension Plan specifically provides in relevant part as follows:

14.4 Claims and Appeals
Under the Plan, the Claims Administrator and the Appeals Administrator are fiduciaries to whom this Plan hereby grants full discretion, with the advice of counsel, to do the following: to make findings of fact; to interpret the Plan and resolve ambiguities therein; to make factual determinations; to determine whether a claimant is eligible for benefits; to decide the amount, form, and

-3-

timing of benefits; and to resolve any other matter under the Plan which is raised by the claimant or identified by the respective Claims or Appeals Administrator. The Claims Administrator has exclusive authority to decide all claims under the Plan, and the Appeals Administrator has exclusive authority to review and resolve any appeal of a denied claim. In the case of an appeal, the decision of the Appeals Administrator shall be final and binding upon all parties to the full extent permitted under applicable law, unless and to the extent that the claimant subsequently proves that a decision of the Appeals Administrator was an abuse of discretion[.]

The initial determination of eligibility for a disability pension under the Pension Plan is made by the Verizon Benefits Delivery Disability Processing Unit ("Disability Processing Unit"). An applicant whose claim is denied may obtain review by the Verizon Claims Review Committee ("VCRC"), the designated appeals administrator under the Pension Plan.

On September 8, 2005, plaintiff commenced a medical leave from her position as customer service representative because of low back pain. She was diagnosed with chronic degenerative disc disease and treated by chiropractors Christopher Green and Douglas Van Vorst. On October 21, 2005, Dr. Van Vorst completed forms indicating that plaintiff could return to work on a graduated basis, beginning with four hours per day, five days a week. She returned to work, but on November 23, 2005 again went on leave because of increased low back pain. During the first 52 weeks of disability, she received benefits through a short-term disability plan that is not now in issue.

Plaintiff applied for a disability pension under the Pension Plan. Metropolitan Life Insurance Company ("MetLife"), which provides administrative services to Verizon in connection with its various employee benefit plans, obtained information and medical records from plaintiff's health care providers and forwarded them to a clinical nurse for review. The MetLife nurse concluded that the records supported "sedentary to light level of function with

ability to change position every 15 minutes" with the use of a sit/stand work station which would permit her to sit, stand or walk intermittently.  The nurse referred the records to MetLife's medical director for review.

MetLife also obtained an "activities check" (*i.e.*, video surveillance) of plaintiff by an investigation company.  On October 10, 2006, the company sent MetLife a surveillance video and a report summarizing the results of the surveillance of plaintiff on September 26, 27, 28, 29 and 30, 2006.  MetLife takes the position that plaintiff's activities are inconsistent with her claim of disabling back pain.

On review of plaintiff's medical records and the results of the video surveillance, MetLife's medical director, Dr. Desmond Ebanks, wrote a claim note dated October 10, 2006, stating that "the medical documentation and video surveillance does not support a functional impairment precluding [plaintiff] from performing the essential functions of a sedentary job with a sit/stand workstation."  MetLife also obtained review by a vocational rehabilitation specialist, who reported on November 6, 2006 that plaintiff was capable of performing her customer service representative job with the use of a sit/stand work station, which would allow her to work at either a standing height or a seated height at will with only the push of a button.

Plaintiff's application for Social Security disability benefits was approved on December 7, 2006.  On December 29, 2006, MetLife recommended denial of plaintiff's request for a disability pension on the ground that the medical information submitted by plaintiff and her treating health care providers did not support her claim that she was totally disabled.  On January 29, 2007, the Disability Processing Unit wrote to plaintiff denying her disability benefits under the Pension Plan.

-5-

Plaintiff appealed the denial to the Verizon Claims Review Committee ("VCRC"), the designated appeals administrator under the Pension Plan. As part of its review of plaintiff's appeal, the VCRC obtained a record review by Dr. Brian Morris, Verizon's medical director. Dr. Morris' report dated September 13, 2007 concluded that plaintiff did not meet the definition of disability under the Pension Plan because she was capable of performing sedentary work, and that the sit/stand work station offered to her by Verizon would assist her in performing such work.

The VCRC reviewed plaintiff's appeal at its September 27, 2007 meeting. By letter dated October 1, 2007, the VCRC upheld the denial of plaintiff's claim for a disability pension under the Pension Plan. Plaintiff commenced the instant ERISA action on October 18, 2009.

### THE MEDICAL EVIDENCE

The medical evidence in the file includes the medical records of Douglas Van Vorst, DC, DACRB, a chiropractor; Christopher Green, DC, also a chiropractor; Thomas J. Lovely, MD, a neurosurgeon to whom plaintiff was referred by Dr. Van Vorst; and Robert M. Droege, MD, her primary care physician. She also underwent an IME by Louis Benton, Jr., MD, an orthopedic surgeon. Dr. Benton's report was not part of the administrative record, although Dr. Van Vorst addressed it in a letter and Dr. Morris referred to it in his report to the VCRC.

The earliest medical record is an MRI report dated April 18, 2003, stating "Clinical History: Low back pain and radiculopathy." The "Impression" includes: "Central Annular Tear at L3-L4" and "Small central disc protrusion at L4-L5."

In an examination report dated September 13, 2005 – shortly after plaintiff began short-term disability leave on September 8, 2005 – Dr. Green wrote:

> HISTORY/CHIEF COMPLAINT: The patient is here today with a chief complaint of severe right low back pain. ... She has been seen numerous times

in this office before with similar pain and has had MRI in past with disc problems at both L3/4 and L4/5, annular tear L3/4 and herniation central L4/5. She has had facet injections and ESI's in the past with minimal success and has seen spine surgeon who felt she was not a surgical candidate.

The examination reveals tenderness upon palpation severe spasm in the right lumbrosacral area decreased ROM in all planes, positive SLR left and moves to right to 30 degees with LBP, neg. stretch, negative Braggard's test, positive Kemp's test on rt. positive SI Compression test, pos Elys on right. Motor strength is breakaway secondary to pain of quad on rt. EHL and gastroc 5/5. Dermatone testing intact and symmetric. Static and motion palpation reveals loss of intersegmental mobility L 4/5/S 1. The patient filled out an Oswestry Low Back Pain Questionnaire today and scored 82%. Pain diagram details stabbing L/S area.

DX/IMPRESSION: Lumber Disc Derangement Syndrome vs. Lumbar facet syndrome.

Office notes show plaintiff made repeated visits to Drs. Green and Van Vorst for chiropractic treatment in the months following this report.

Upon Dr. Van Vorst's recommendation, plaintiff was examined by Thomas J. Lovely, MD, a neurosurgeon. In a March 16, 2006 report, Dr. Lovely stated he reviewed an MRI scan from January 2006 and noted "significant degenerative changes at what I would call L4-5 and L5-S1." He ordered a lumbar discography.

It appears from a "progress report" from "Sunnyview at Amsterdam" that, on Dr. Lovely's referral, plaintiff began physical therapy on April 11, 2006. The record copy of the report is illegible. Dr. Van Vorst wrote on December 22, 2006 that physical therapy was "no help."

The report of the lumbar discography is dated May 10, 2006. It states "Clinical Information: Right lower back and buttock pain." Under "Impression" the report states: "Abnormal discogram at L-3-L-4 and L-4-L-5. There is evidence of annular tear with contrast extravasation into the anterior epidural space. Her symptom was reproduced during injection of

-7-

contrast material at both L3-L4 and L-4/L-5."

Dr. Lovely reported to Dr. Van Vorst on June 15, 2006 that he saw plaintiff "in follow-up of her chronic low back pain, which has now been going on for about three years." He noted that plaintiff "has had extensive conservative measures with injections, chiropractic treatment and is currently undergoing physical therapy with still continued significant pain in the low back." He reviewed the discogram and noted she was "positive at both the 3-4 and 4-5 levels" and had "significant internal degenerative changes." He observed that plaintiff's "gait is normal "but that she "is markedly limited with range of motion." Dr. Lovely wrote:

> Ms. Ross appears to have discogenic low back pain at L3-4 and L4-5 with a sacralized L5-S1 level. Her options at this point are to do nothing, to continue with conservative measures or alternatively to consider a decompression and fusion. In layman's terms I described a posterior lumbar interbody fusion and posterolateral fusion with instrumentation at L3-4 and L4-5. I emphasized that this is a very large undertaking and should only be done as a last resort. While I believe it has a good chance of helping her in the immediate future, 10, 20 or 30 years down the road it will put increased stress and degenerative changes on the upper lumbar segments, which are not designed to take this. Therefore, this should really be only done if she is absolutely incapacitated with the pain and it is interfering with her life completely. As this has been going on for three years, and she has had aggressive conservative treatment, this certainly may be the case. We discussed the procedure as I said in layman's terms along with the potential benefits and risks (including but not limited to the risks of anesthesia, injury to the nerves with weakness or paralysis, loss of sensation, loss of bowel, bladder and sexual function or feeling, blindness, spinal fluid leak, bleeding, infection, failure to improve, increased stress at the adjacent levels, failure to fuse, etc.).... I gave her an okay to be out of work for a month. I believe by that time she needs to make a decision whether she wishes to pursue surgery or continue with conservative management.

An examination report by Dr. Van Vorst dated July 12, 2006 states:

> INTERIM EXAMINATION:
> The patient is being re-examined today. She has been attending PT per Dr. Lovely and my suggestion but this is really not helping. She has some back relief for a day or so and the pain comes back. She continues to have activity

intolerance with sitting, lifting, bending, walking, prolonged standing and sleeping. VAS today is 8/10. She is contemplating surgery but Dr. Lovely has explained to her that it is very involved and in her case she has two bad discs per discogram and will need a multilevel fusion and is a smoker. She has been taken OOW by Dr. Lovely, total until 7/17/08.

The examination reveals tenderness upon palpation, spasm in the lumbosacral area, most notably on the right, severely decreased ROM in all planes, positive Kemp's test left & right, positive SLR left & right for low back pain. Motor strength 5/5/ gastroc and EHL but breakaway sec. to LBP at quads. Dermatome testing is symmetric. Static and motion palpation reveals loss of intersegmenta mobililty L 3/4/5. The patient filled out an Oswestry Low Back Pain Questionnaire today and scored 54%. Pain diagram details ache stabbing L/S area.

DX/IMPRESSION:
Lumbar Disc Derangement Syndrome w/ VSC's

Ms. Ross continues to have chronic LBP sec. to bad discs at L3/4 and L4/5. She is unable to sit or stand for any length of time nor lift at all. She is very apprehensive about surgery at this time and does not really want to go forward with this. PT is really not helping. I explained that you can do all the stabilization in the  world but as soon as you bend with a bad disc it sets the disc off and you have pain. At this point I am going to give her a permanent disability as she is totally disabled from her previous job as she is unable to sit or drive to get to work. I explained that this can be updated if she has surgery and is functional following this. Her prognosis is poor as her condition has not changed in 10 months. Treatment today consists of CMT, prn.

On July 20, 2006, in response to an inquiry from MetLife's disability manager requesting that he "consider an ergonomic evaluation for sit/stand workstation," Dr. Van Vorst wrote:

Restrictions: No lifting or bending to ground level, only able to sit for 15 minutes at any one time.... Unable to stand longer than 15 min. w/o sitting or lying down, no lifting over 5 lb. from waist level. Permanent restriction. To be updated if she has surgery.  So, unable to return to full duty.

In an office note dated September 15, 2006, plaintiff's primary care physician Dr. Droege observed that Dr. Van Vorst recommended no prolonged sitting, lifting or standing, and that Dr. Van Vorst "feels she is permanently disabled from her current job and from what she is telling

-9-

me, it sure sounds like she is." Dr. Droege stated: "She has a note from Dr. Lovely who recommended consideration for surgery but he did not feel strongly it would help her. She does not want surgery." Dr. Droege further stated: "Chronic back pain with history of bulging L4-5 with no hard physical findings, very likely permanently disabled from her current job since she has been out now for over a year with pain worsening over 3 years." He added: "Suggested continued chronic pain med use, not any evidence of overuse or abuse of her narcotics.... I also recommended trial of amitriptyline 10-30 mg at night to see if augments the Lortab and may actually help her use less."

A November 3, 2006 memo from Dr. Van Vorst states:

> To Whom It May Concern.
> Ms. Ross has discogenic back pain. This was confirmed with a discogram.
> She is a candidate for surgical fusion per neurosurgeon but this is a big
> undertaking and serious surgery which may or may not be successful.
>
> Apparently there continues to be some question whether she can work or not.
> She is unable to sit, stand or walk[] for any significant period. She is unable
> to do any activity which involves any repetitive bending or sitting. A detailed
> description of a work to stand work station was explained to me. She is
> unable to use a work to stand work station as this involves repetitive bending,
> standing.
>
> As I have said in the past, a functional capacity test would be the best
> assessment tool to determine her capabilities to work and will help quantify
> this. Until then, I don't feel she can work in any significant capacity.

The November 21, 2006 office notes of Dr. Droege state: "She has been continuing to have pain although it is nicely controlled with her Lortab 2-3 times daily. Amitriptyline has helped significantly allowing her to sleep significantly. Very satisfied with her current treatment program." He writes: "chronic low back pain with history of bulging discs, candidate for surgery but trying to hold off on it for now" and "insomnia due to pain improving." He gave her a

prescription for Lortab with one refill.

The December 11, 2006 examination report by Dr. Van Vorst states:

> Ms. Ross called and scheduled an appointment today due to increased low back pain....
>
> The examination reveals: Patient is antalgic in flexion. She has a positive Minors Sign, positive Valsalvas, grade 4 tenderness and spasm upon palpation, severely decreased flexion and extension, left and right lat bending, positive SLR for LBP left and right, negative Braggart's test left & right, positive Kemp's test, positive Valsalva's for low back pain. Motor and sensory intact.  SC L3/4/5/S1.
>
> DX/IMPRESSION:
> Multilevel Lumbar Disc Derangement Syndrome w/ VSC
>
> Ms. Ross continues to have acute bouts of chronic recurrent LBP due to disc pathology. Case is complicated by the fact she has had injections of facet joints, SI joints and multiple ESI's along with CMT and physiotherapy with no significant relief. She has pos. discogram and continues to wait on surgery. She has palliative relief with CMT and physiotherapy. Treatment today consists of CMT. Patient should return prn.
>
> add: Ms. Ross gave me a copy of the Met Life Long Term Disability Benefits letter which denied her benefits. I did read the letter and make the following comments concerning the letter/denial. There is no mention of the positive discogram to confirm disc pathology nor is there any reports from Dr. Lovely which substantiate clinical confirmation, as we have in our chart. There is also no mention of Dr. Droege's records concerning this patient. Apparently she had some surveillance video which showed her walking and bending with no problems. I suggested patient get these videos for our review as this is not consistent with her presentation at our office, although it should be noted that at times this patient is likely not antalgic and can bend at times, she comes to our office when she isn't feeling well and has clinical signs. Most disc patients have periods of less pain and an improved ability to bend and then suffer acute bouts.

On December 22, 2006, Dr. Van Vorst completed a Long Term Disability Claim Form Attending Physician Statement for MetLife.  It states that plaintiff's "subjective symptom" is back pain, and the objective findings are "Discogram for back L 4/5 3/4."  He added: "Suggest FCE

-11-

[functional capacity examination]."  He noted that physical therapy and a pain management

program were "no help."

On office notes from February 21, 2007, Dr. Droege wrote: "would like to increase to 4

Lortab daily instead of the 3, getting pretty good relief but its not covering her for the whole time

she is awake.... Still have very limited mobility of her low back."  He added: "chronic back pain.

Now on disability which I think is reasonable."  He wrote that he would "increase her Lortab

prescription to 110 tabs per month allowing her to use 4 tabs most days and 3 tabs other days."

On April 26, 2007, Dr. Van Vorst wrote to Cuna Mutual Insurance, apparently in response

to a January 17, 2006 IME report by Louis Benton, Jr., M.D.  In the letter, Dr. Van Vorst stated:

> My patient, Ms. Ross, has asked me to review and give my opinion as it
> relates to the independent medical examination and opinion of Louis Benton,
> M.D. of 1/17/07.
>
> I had the opportunity to review the IME. I found his history and examination
> to be accurate. He does speak of her positive discogram confirming discogenic
> pain syndrome which she suffers from. He also reports of the symptomatic,
> clinically significant annular tears of the discs. He confirms her inability to sit
> and the need to take LORTAB every 6 hrs. as well as medications to sleep. He
> reports that she is now receiving Social Security Disability as a result of her
> condition. It should also be noted that this patient suffers from fibromyalgia
> which Dr. Benton reports. Her pain scale reading on the day of examination
> was 8-9/10 consistent with examinations in my office at times when she is
> acute.
>
> His history taking and examination appears to be accurate but he then goes on
> to state that this patient can work 4 hrs per day 5 per week with breaks from
> sitting. I do not agree with this assessment. This is purely his subjective
> opinion and not supported by the facts. It is my opinion that she is totally
> disabled from her previous job.

In an undated letter to plaintiff's attorney, Dr. Van Vorst wrote:

> In response to your letter of May 25, 2007 requesting a narrative summary
> outlining diagnosis, treatment and prognosis on my patient Pam Ross.

-12-

Ms. Ross suffers from discogenic low back pain. She has been treated for a number of years for this condition. She has had extensive treatment and diagnostic testing to date including x-rays, multiple MRI scans and discograms. She has been treated with medications, injections, manipulative therapy and exercises with minimal success. She has confirmed discogenic disease per discogram at the L3/4 and L4/5 levels.... As a result of the discogenic pain she suffers acute severe bouts of low back pain and is unable to sleep, stand upright or sit when acute. These episodes are triggered by any lifting from floor level, activities involving repetitive bending and any prolonged sitting, as a result she has been unable to work.

She has seen neurosurgeon Dr. Lovely who has suggested surgery as nothing else has helped her. She has been apprehensive about having this surgery as it is extensive and involves multilevel fusion of the lumbar spine with potential for disc problems at levels above the fusion in the future.

Her prognosis at this time is poor. Her condition at this time is permanent. Due to her inability to lift, sit for any prolonged period of time, and number of acute exacerbations she suffers, she is not employable and has been given a marked 75% disability.

Plaintiff's primary care physician, Dr. Droege, provided plaintiff's attorney with a summary of plaintiff's condition dated May 31, 2007.  He stated:

I have been following Pam Ross for serveral years.  She does have chronic back pain.... She recently had an MRI scan of her low back which defined some changes, namely chronic degenerative changes at T10, L3 and L4 and a right paracentral disc herniation at the level of L4.... I last examined her on 2/21/2007.  At that time, she was in moderate distress from her back pain. She was tender in both S1 notches.  Straight leg raising was positive with pain at 45 degrees bilaterally.  Treatments that I am doing is periodically prescribing some Lortab 3-4 tablets daily for symptomatic relief along with stretching and working with her chiropractor.  At this point, it seems that her pain has stabilized and it is not getting any worse, not getting any better. Based on the degree of discomfort that she appears to be in which is more subjective than objective unfortunately it seems very reasonable that she is unable to work and I do think her condition is probably permanent.  It's hard for me to comment on her degree of suffering but it seems to be fairly moderate.

On July 19, 2007, Dr. Van Vorst wrote to plaintiff's attorney:

I had the opportunity to review the CD from McNeils Investigative Services.

-13-

Inc. taken of my patient Pam Ross. The CD is approx. 44 minutes long and was filmed between Sept. 26-30, 2006. The CD is taken of Ms. Ross at various times during the day. She is observed getting in and out of a truck, carrying various articles including a small child, a dog, groceries and balloons. She is also filmed bending in various positions. The CD is taken during a time period in which Mrs. Ross was not being treated by myself and was obvious[ly] not acute at the time as she does not appear to be having difficulty with any of the above activities.  As mentioned in my reports and a recent narrative, I have treated Ms. Ross at times when she was acute with discogenic back pain. I have advised her in the past of proper ways to lift and to avoid sitting for long periods, avoid lifting heavy items from the floor level but have encouraged her to try and live a 'normal' active life if possible. Patients who suffer from discogenic back pain, clinically confirmed, have periods of severe back pain and at times may not have much pain at all until acute. The CD is of a relatively short period of time and not truly representative, in my opinion, of this patient's life style or functionality over a long duration of time, certainly not during an acute bout of back pain.

The letter concludes: "The CD does not change my opinion as stated in previous reports."

## THE ADMINISTRATIVE DETERMINATIONS

Upon initial review of plaintiff's application for a disability pension under the Pension Plan, Dr. Ebanks, MetLife's medical director, wrote a claim note dated October 10, 2006, stating that "the medical documentation and video surveillance does not support a functional impairment precluding [employee] from performing the essential functions of a sedentary job with a sit/stand workstation."  He summarized the video surveillance as follows:

[Employee] is observed on the five consecutive days captioned above. Little activity is noted on the first and fourth days. On the other 3 days, [employee] is observed in a variety of activities. Most significantly is the quality of her movements; her stance and gait were always normal without evidence of a limp, her movements were fluid and without hesitation and she [was] not observed to stretch or hold her back in a manner consistent with stiffness or discomfort. On 9/27/06, [employee] was observed walking short distances bending forward at the waist into her truck, entering and exiting the truck without difficulty and driving several minutes to the post office to retrieve mail and a small box. On 9/28/06, [employee] was observed easily entering her truck and driving about 10 minutes to a store. She easily exited the vehicle, leaned into the back seat to pick up a small toddler (approx. 20 lbs)

-14-

and carry him in her left arm into the store without apparent difficulty or strain. She was observed walking around the store pushing a shopping cart, lifted the child and a few packages into her truck and drove home. [Employee] was later observed standing approximately 14 minutes while assembling a toy in her driveway. On 9/30/06, [employee] was observed walking around short distances without a limp and changing directions without hesitation. She was observed bending forward at the waist, squatting and crouching beside a motorcycle and while playing with two small dogs in the yard. She was also noted to bend forward to lift a small dog from the ground and carry it into her garage.

Dr. Ebanks wrote:

There can be no disputing the objective findings of degenerative spine and disc disease with annular tears noted on [employee's] diagnostic studies. Whether these findings produce clinically significant pain and subsequent disability, and if so, to what extent, are the pertinent questions. Undoubtedly, these findings can cause a varying degree of discomfort but they can also be found in a significant portion of same-age peers in the adult population without appreciable pain or disability. Video surveillance demonstrated [employee's] functional abilities to be considerably greater than that which she has led her [health care providers] to believe. She demonstrated her ability to easily change positions between sitting, squatting, crouching, standing and walking without apparent discomfort. The quality of her movements are inconsistent with those typical of someone with unrelenting, disabling back pain and, with her [health care providers] estimate that she is totally disabled from performing even a sedentary job with a sit/stand workstation.

As part of its administrative review, MetLife also obtained review by a vocational rehabilitation specialist who stated on November 6, 2006 that the duties associated with the customer service representative position were sedentary and generally involved sitting at a computer and phone station, typing, and responding to customer complaints and inquiries; that in October, 2006, Verizon informed Ms. Ross that it had put in place a sit/stand work station, which would have allowed her to self-accommodate by working at either a standing height or a seated height at will with only the push of a button; and that plaintiff had not returned to work. The vocational rehabilitation associate advised that Ms. Ross was capable of performing her own job

-15-

with the ability to self-accommodate.  On December 29, 2006, MetLife recommended to defendant that it deny plaintiff's request for a disability pension on the ground that the medical information submitted by Ms. Ross and her treating health care providers did not support her claim that she was unable to work or was totally disabled.

On January 29, 2007, the Disability Processing Unit wrote plaintiff a letter that quotes directly from MetLife's December 29, 2006 recommendation.  The decision states:

> In order to determine if you are "totally disabled" as defined by your plan, we reviewed your entire pension claim file as well as prior medical history that was previously submitted to MetLife for review. You are claiming disability based on a diagnosis of degenerative spine and disc disease with annular tears. While the medical documentation on file does include exam findings that confirm your diagnosis, these findings do not necessarily result with significant pain and subsequent disability. These exam findings can cause a varying degree of discomfort, but they can also be found in a significant portion of same aged peers without appreciable pain or disability.
>
> The available medical documentation that has been provided indicates that you have tried various forms of treatment to alleviate your symptoms, including but not limited to: chiropractic care, physical therapy, facet and SI Joint injections and medication, all without significant improvement. Your doctor reported that you have discussed the possibility of surgery as a last resort, but at this time, you have declined.
>
> In an activity check conducted from September 28, 2006 through September 30, 2008 you were clearly able to demonstrate an ability to easily change positions between sitting, squatting, crouching, standing and walking without apparent discomfort. The quality of your movements was inconsistent with those typical of someone with unrelenting, disabling back pain. Your stance and gait were normal without evidence of a limp, and your movements were fluid and without hesitation. You did not appear to stretch or hold your back in a manner that would be consistent with stiffness or discomfort.  It was indicated that you do more activity than suggested by your doctors, as well as ability to alternate sitting and standing.
>
> The most recent medical information provided by Dr. Douglas Van Vorst dated December 11, 2006, reports that you have a history of low back pain and recently had increased pain due to bending over the wrong way the prior weekend. Although Dr. Van Vorst mentions muscle spasm, decreased range

of motion and pain, there were no current specifics, regarding actual range of motion of your back and he also indicated that your strength and sensation were normal. Dr. Van Vorst noted that you have had relief of symptoms with physiotherapy and chiropractic massage therapy and you were to return as needed. The medical information did not indicate you are currently taking any type of medications including pain medications, anti-inflammatory medications or medications for muscle spasms. There was no medical information from any other provider to indicate a worsening of symptoms or current treatment plan.

Previous medical reviews by the Nurse Consultant and Medical Director on October 10, 2006 and November 5, 2006 concluded you had a work capacity. There is essentially no additional medical information submitted for review that documents a change in your condition. Therefore, the medical information submitted for the review of disability pension benefits does not support your inability to work or that.you are totally disabled as described in your Plan.

Since the medical documentation submitted does not support a total disability as defined by the Plan, we have no alternative but to deny your request for a Disability Pension.

By letter dated July 25, 2007, plaintiff sought VCRC review of the denial of plaintiff's claim.  Included with the appeal letter was the letter from her treating chiropractor, Dr. Van Vorst, dated July 19, 2007, addressing the surveillance video.

As part of its review, the VCRC obtained a record review by Dr. Brian Morris.  On this motion, defendant states that Dr. Morris is an independent contractor who performs services for the VCRC upon request, that he is compensated for his services based upon the amount of time he spends, and that his compensation is not affected by the opinions or conclusions he renders or the disposition of claims or appeals.  Plaintiff responds that "Dr. Morris is not 'independent' of Verizon Communications, Inc. or the VCRC" and that he "worked as the Medical Director of both."

Dr. Morris conducted a file review of plaintiff's records.  He did not perform a physical

-17-

examination of plaintiff.  He did not list the surveillance video as among the items he reviewed,

and it appears that his discussion of it is based on Dr. Ebanks' summary.  Dr. Morris' report,

dated September 13, 2007, contains a lengthy summary of plaintiff's medical records.  It includes

the following:

> On 09-14-06, a vocational rehabilitation specialist from MetLife sent Dr. Van Vorst a note asking him to restate his restrictions in light of the fact that Ms. Ross would be equipped with a sit/stand work station. On 09-22-06, Dr. Van Vorst responded by suggesting that MetLife order a functional capacity evaluation in order to help him answer that question. MetLife indicated to Dr. Van Vorst that they would not be paying for a functional capacity evaluation. On 09-26-06, Dr. Van Vorst informed MetLife by telephone that Ms. Ross was not fit to return to work even with the sit/stand work station; he confirmed this in writing on 11-03-06.

> In an office note dated 09-15-06, Dr. Droege commented on Ms. Ross' application for Social Security disability benefits by stating, "I warned her that it may not go through because she does not have any hard objective findings."

> Ms. Ross was placed under video surveillance from 09-26-06 through 09-30-06. Ms. Ross demonstrated the ability to easily change positions between sitting, squatting, crouching, standing, and walking, all without apparent discomfort. She was able to lift a small child, a small dog, and small parcels. Ms. Ross' stance and gait were normal without evidence of a limp. Her movements were fluid and without hesitation. She did not appear to exhibit any low back stiffness or discomfort. Overall, the quality of her movements was inconsistent with those typical of someone with unrelenting, disabling low back pain. In fact, the video surveillance suggested that Ms. Ross was able to perform more activities than advised by her treatment providers, particularly alternating between sitting and standing.

> At MetLife's request, the medical record was reviewed by internist Desmond Ebanks, MD. Dr. Ebanks acknowledged the abnormalities on the discogram and MRI scans. However, he noted that these findings could be present in individuals who were not experiencing any appreciable discomfort. He commented on the video surveillance data, which seem to contradict Ms. Ross' claim of total disability. Dr. Ebanks concluded that the evidence did not support a claim of functional impairment that would preclude Ms. Ross from performing a sedentary job with a sit/stand work station.

On 11-21-06, Ms. Ross was seen by Dr. Droege. In his note, he commented that Ms. Ross' pain was "nicely controlled with her Lortab 2-3 times daily" and that Ms. Ross was "very satisfied with her current treatment program."

On 11-21-06, MetLife informed Ms. Ross that her claim for LTD benefits had been denied effective 10-19-06. The letter noted that Ms. Ross' record had been reviewed by the Verizon Medical Director, a nurse consultant, and a vocational rehabilitation counselor. All were in agreement that Ms. Ross was capable of performing her sedentary job as a customer service administrator, given that she could self-accommodate with a sit/stand work station.

Dr. Morris' report then lists the following "key points":

- Ms. Ross does have objective findings by discogram and MRI scan. However, these findings can be present in individuals who report minimal or no significant back pain.
- The issue of the subjectivity of Ms. Ross' pain was raised by her primary care physician in an office note from May 2007.
- Ms. Ross appears to be a candidate for spinal fusion surgery, yet she had not seen Dr. Lovely in over one year.  In general, if one has truly disabling pain and conservative measures are ineffective, one would opt for surgical treatment.
- In late 2006, Desmond Ebanks, MD reviewed Ms. Ross' record and concluded she could perform sedentary work with a sit/stand work station.
- In January 2007, independent medical examiner Louis Benton, MD concluded that Ms. Ross could work part time.
- Video surveillance from September 2006 demonstrated functionality completely inconsistent with Ms. Ross' claims of impairment.

Dr. Morris' report concludes:

Based upon the information above, it is my medical opinion that Ms. Pamela Ross meets the 'any job' standard of the Plan and, therefore, is not disabled as per the definition under the Plan.  She appears to be capable of performing sedentary work, even if it is on a part-time basis.  The sit/stand work station should be helpful.

By letter dated October 1, 2007, the VCRC upheld the denial of plaintiff's claim.  The VCRC decision contains the following:

<u>Initial Review</u>
- In response to Ms. Ross' request for a Disability Pension, MetLife

-19-

reviewed her file and stated that she is claiming disability based on a diagnosis of degenerative spine and disc disease with annular tear. The medical information provided indicates that Ms. Ross has tried various forms of treatment including but not limited to chiropractic care, physical therapy, facet and SI Joint injections and medication, all without significant improvement.

- Surveillance conducted from September 26, 2006 through September 30, 2006, revealed that Ms. Ross was able to easily change positions between sitting, squatting, crouching, standing and walking without apparent discomfort.

- Medical information provided by Dr. Douglas Van Vorst dated December 11, 2006, indicated that Ms. Ross has a history of low back pain and recently had increased pain due to bending the wrong way. Although Dr. Van Vorst mentioned muscle spasm, decreased range of motion and pain, there were no specifics regarding range of motion. Additionally, no information was provided regarding prescribed medications, such as pain medications, anti-inflammatory medications, or medications for muscle spasms.

- Previous medical reviews by the MetLife Nurse Consultant and Medical Director dated October 10, 2006 and November 5, 2006 concluded that Ms. Ross did have work capacity. No additional information was provided that documented a change in Ms. Ross' condition; therefore, her request for a Disability Pension was denied by the Verizon Disability Processing Unit.

Review by the Committee

- In your letter to the Committee, you requested an additional review of Ms. Ross' appeal for a Disability Pension and submitted the following information for review:

  - An undated letter from Douglas J. Van Vorst, DC, DACRB, and letters dated July 19, 2007 and April 26, 2007;

  - A letter from Robert Droege, MD dated May 31, 2007;

  - Office visit notes from Robert Droege, MD dated September 15, 2006 through February 21, 2007;

  - Pharmacy expense summary from Hannaford Food & Drug from January 21, 2006 through July 26, 2006; and

  - Pharmacy expense summary from Wal-Mart from January 4, 2006 through April 27, 2007.

The Verizon Medical Director reviewed Ms. Ross' file in its entirety and stated that based upon the information provided, he opines that Ms. Ross meets the "any job" standard of the Plan and, therefore, is not disabled as per the definition under the Plan. The Medical Director states Ms. Ross appears to be capable of performing sedentary work, and a sit/stand work station

-20-

would be helpful.

Records indicate that upon exhausting her Sickness Disability Benefits, Ms. Ross was notified that a sit/stand workstation was available for her upon her return to work in a letter from her supervisor, Sharon Fields, dated October 30, 2006.

The Committee upheld the Verizon Disability Processing Unit's denial of Ms. Ross' request for a Disability Pension based on the provisions of the Plan.

Plaintiff then brought this action.

## DISCUSSION

**Applicable Law**

The terms of the Pension Plan before the Court granted defendant the discretion to interpret the policy and determine participant eligibility.  Thus, the "arbitrary and capricious" standard applies to this Court's review of defendant's decision.  *See Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).  Under this standard, the Court can reverse the decision "only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Id.* at 83.  Summary judgment is appropriate "only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002).

**Conflict of Interest**

In arguing that defendant arbitrarily and capriciously denied her benefits, plaintiff points to the fact that defendant both evaluates and pays out the benefits claims.  Defendant's dual role creates a conflict of interest that must be weighed as a factor in determining whether it has abused its discretion.  *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  "[W]hen judges review the lawfulness of benefit denials, they will often take account of several different

-21-

considerations of which a conflict of interest is one." *Id.* at 117; *accord Hobson*, 574 F.3d at 83.

In discussing the weight to be given such a conflict of interest, the *Glenn* court stated:

> [A] conflict of interest ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

554 U.S. at 117 (citations omitted).

On this subject, defendant relies on the declaration of Philip L. Storms, Director of Benefits of the Verizon Corporate Resources Group, LLC, a subsidiary of Verizon Communications Inc.  Storms explains that plaintiff's claim was initially reviewed by MetLife, which provides administrative services to defendant in connection with various employee benefit plans, including administrative services relating to claims for disability pensions under the Pension Plan, and that MetLife recommended denial.  Storms further explains that he is a member of the Pension Plan's designated appeal review committee, the VCRC, which comprises senior management employees of Verizon and/or its affiliates, and that neither the compensation nor performance reviews of VCRC members are influenced or affected by decisions rendered by the VCRC, or by whether claims or appeals under Verizon's various benefit or pension plans are approved or denied by the VCRC.

By its terms, the Pension Plan is funded by contributions from each participating company, including Verizon Communications, Inc.  Assets of the Pension Plan are held in a pension fund trust which is separate from the assets of Verizon or any other participating

-22-

company.  Plaintiff notes the undisputed fact that according to a Verizon Annual Report the

Pension Plan was under-funded by almost $2 billion in 2007.[2]

In response to an interrogatory from plaintiff,[3] defendant states:

> During the period 2007 through 2008 inclusive, there were 152 applications for disability pension under the Verizon Pension Plan for New York and New England Associates.  Of those 152 applications, 78 were approved and 20 were denied. The remainder of the 152 applications ended with some closure other than approval or denial.  Examples of such other closures would include circumstances such as withdrawal or abandonment of an application by the applicant; an employee's returning to work; an employee's death; an employee's electing some other benefit such as a lump sum pension benefit; or some other circumstance leading to the closing of the application prior to a decision approving or denying the application.
>
> ***
>
> ... Defendant states that none of the 20 denials of applications for disability pensions set forth above were the subject of litigation; accordingly, none of these denials resulted in a judicial decision overturning the administrative determination denying the application.

The Court concludes that the conflict of interest is factor weighing lightly against

defendant.  This conclusion is supported by the following: the funding structure of the Pension

Plan; the fact that the claims are initially reviewed by MetLife, which denied plaintiff's claim;

---

[2]

Plaintiff further states that, according to a Verizon Annual Report in 2009, Verizon was advised by three primary rating agencies that Verizon's bond ratings could be downgraded due in part to under funded pension funds.  In response, defendant admits that Verizon's Annual Report for 2009 contains a note which includes the following sentence: "While we do not anticipate a ratings downgrade, the three primary rating agencies have identified factors which they believe could result in a ratings downgrade for Verizon Communications and/or Cellco Partnership in the future including sustained leverage levels at Verizon Communications and/or Cellco Partnership resulting from: (i) diminished wireless operating performance as a result of a weakening economy and competitive pressures; (ii) failure to achieve significant synergies in the Alltel integration; (iii) accelerated wireline losses; (iv) the absence of material improvement in the status of underfunded pension balances; or (iv) an acquisition or sale of operations that causes a material deterioration in its credit metrics."  Defendant also points out that the 2009 annual report was issued more than two years after the VCRC denied plaintiff's appeal.

[3]

The declaration of Daniel Fleming explains the timing of defendant's response to the interrogatory.  The circumstances do not warrant imposing a negative inference or other sanction against defendant.

defendant's showing that the VCRC members lack incentive to deny claims; and the fact that in 2007 and 2008 only 13% of applications for disability pensions under the Pension Plan were denied.

**Social Security Decision**

Plaintiff also points out that defendant did not reconcile its determination with the determination of the Social Security Administration ("SSA") that plaintiff was qualified for Social Security disability benefits based on the finding that plaintiff was disabled under 42 U.S.C. § 423(d)(1)(A).[4]  As a general rule, a disability insurer's failure to consider the SSA's finding of disability in reaching its own determination of disability "does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review."  *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006), *aff'd Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  Although plan administrators are encouraged to explain their reasons for determining that claimants are not disabled when the SSA arrived at the opposite conclusion, the failure to do so does not, by itself, render an administrator's denial of disability benefits arbitrary and capricious, particularly where the administrator's decision is supported by substantial evidence. *See Hobson*, 574 F.3d at 92.

In the case at bar, Dr. Morris' report acknowledges that plaintiff was awarded Social Security disability benefits.  Defendant argues that it could not be expected to engage in a discussion of the SSA award because plaintiff produced only the SSA's award letter but not the SSA's underlying decision, and therefore defendant did not know what evidence the SSA

---

[4]

42 U.S.C. § 423(d)(1)(A) defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

considered or how it evaluated the evidence.[5]  Plaintiff's counsel states that the SSA does not issue an explanatory decision when it grants benefits based on medical evidence.  Under the circumstances, the Court treats the absence of an explanation for reaching a different conclusion than the SSA as a factor weighing lightly in plaintiff's favor.

**Medical Evidence of Disability Due to Pain**

It is undisputed that plaintiff has degenerative spine and disc disease with annular tears. The medical records are replete with evidence that, due to this condition, plaintiff has back pain. The record contains evidence that plaintiff reported and sought relief for her back pain as early as April 2003 when she had an MRI based on a clinical history of "Low back pain and radiculopathy."  Plaintiff's treating health care providers all report that she has back pain and have treated her with chiropractic therapy, physical therapy, facet joint and sacroiliac injections, and prescription drugs, including Lortab, a narcotic pain medication, amitriptyline for "insomnia due to pain", and Flexeril, a muscle relaxant.  Dr. Green wrote on September 8, 2005: "The patient is here today with a chief complaint of severe right low back pain."  Dr. Lovely, plaintiff's neurosurgeon, wrote on March 16, 2006 that the MRI scan reveals "significant degenerative changes at what I would call L4-5 and L5-S1"; he wrote on on June 15, 2006 that he saw plaintiff "in follow-up of her chronic low back pain" and that the discogram was "positive at both the 3-4 and 4-5 levels" showing "significant internal degenerative changes."  Dr. Droege, plaintiff's primary care physician, wrote the following: plaintiff has "chronic back pain with history of bulging L4-5 ... pain worsening over 3 years" (September 15, 2006); plaintiff has "chronic low

---

[5]

As defendant notes, the "treating physician rule" applicable in SSA determinations does not apply to determinations by private benefit plans under ERISA.  *See Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 834 (2003).

back pain with history of bulging discs" (November 21, 2006); plaintiff has "chronic back pain" (February 21, 2007); and "I have been following Pam Ross for serveral years.  She does have chronic back pain.... She recently had an MRI scan of her low back which defined some changes, namely chronic degenerative changes at T10, L3 and L4 and a right paracentral disc herniation at the level of L4...." (May 31, 2007).  Dr. Van Vorst wrote the following: "Ms. Ross continues to have chronic LBP sec. to bad discs at L3/4 and L4/5." (July 12, 2006 ); "Ms. Ross has discogenic back pain.  This was confirmed with a discogram" (November 3, 2006); "Ms. Ross continues to have acute bouts of chronic recurrent LBP due to disc pathology" (December 11, 2006); plaintiff's "subjective symptom" is "back pain" and the "objective findings" are "Discogram for back L 4/5 3/4" (December 22, 2006); "Ms. Ross suffers from discogenic low back pain" (undated letter); and "I have treated Ms. Ross at times when she was acute with discogenic back pain" (July 19, 2007).

Further, there is substantial evidence from her treating providers that plaintiff's pain is disabling.  Dr. Van Vorst wrote on July 12, 2006: "At this point I am going to give her a permanent disability as she is totally disabled from her previous job as she is unable to sit or drive to get to work."  On September 15, 2006, Dr. Droege wrote that plaintiff is "very likely permanently disabled from her current job since she has been out now for over a year with pain worsening over 3 years."  The November 3, 2006 memo from Dr. Van Vorst states: "Apparently there continues to be some question whether she can work or not.  She is unable to sit, stand or walk[] for any significant period.  She is unable to do any activity which involves any repetitive bending or sitting.  A detailed description of a work to stand work station was explained to me.  She is unable to use a work to stand work station as this involves repetitive bending, standing."

-26-

He recommended a functional capacity examination and said: "Until then I don't feel she can work in any significant capacity." Dr. Droege's office notes from February 21, 2007 state: "Now on disability which I think is reasonable." On April 26, 2007, Dr. Van Vorst wrote: "It is my opinion that she is totally disabled from her previous job." In an undated letter Dr. Van Vorst wrote: "Due to her inability to lift, sit for any prolonged period of time, and number of acute exacerbations she suffers, she is not employable and has been given a marked 75% disability." On May 31, 2007, Dr. Droege wrote that "it seems very reasonable that she is unable to work and I do think her condition is probably permanent."

**Dr. Morris' Report**

The VCRC upheld the denial of disability pension benefits under the Pension Plan, concluding that plaintiff was not "totally disabled" because she was not "unable to perform any job." In reaching this decision, the VCRC relied on the report by Dr. Morris, defendant's medical director, summarized above. In his report, Dr. Morris summarized the record and then set forth his analysis in the form of six "key points" supporting his conclusion that plaintiff did not suffer disabling pain.

Dr. Morris stated in the first of his six "key points" that "Ms. Ross does have objective findings by discogram and MRI scan." He added: "However, these findings can be present in individuals who report minimal or no significant back pain." In the next five points, discussed below, Dr. Morris referred to the evidence on which he based his conclusion that, despite the objective findings, plaintiff did not suffer back pain rendering her disabled under the policy.

<u>Subjectivity of Plaintiff's Pain</u>

Dr. Morris' second point is: "The issue of the subjectivity of Ms. Ross' pain was raised by

-27-

her primary care physician in an office note from May 2007."  In the same vein, defendant argues

on this motion that "the cited medical records are nothing more than file notes of Plaintiff's

treating physician reporting and restating [plaintiff's] subjective reports of pain."  The record,

however, includes numerous notations by plaintiff's treating providers reflecting their findings

upon physical examination of plaintiff.  The notes by Drs. Green and Van Vorst on their

examinations of plaintiff beginning in 2005 repeatedly set forth numerous objective physical

indicators of low back pain, including antalgia, tenderness upon palpation, severe spasm, positive

Ely's test, positive Kemp's test, positive Valsalva test, positive Minor's sign, positive sacroiliac

compression test, positive straight leg test, severely decreased flexion and extension, and severely

decreased range of motion in all planes.  Plaintiff's primary care physician, Dr. Droege, stated on

physical examination of plaintiff that she was tender in both S1 notches and that "[s]traight leg

raising was positive with pain at 45 degrees bilaterally."  Dr. Lovely noted that plaintiff "is

markedly limited with range of motion."  Plaintiff's treating providers clearly viewed these

findings as indicators of pain due to her disc disease.

        The statement on which Dr. Morris relied regarding "the subjectivity of Ms. Ross' pain" is

set forth in Dr. Droege's May 31, 2007 report, which states:

> I last examined her on 2/21/2007.  At that time, she was in moderate distress
> from her back pain.  She was tender in both S1 notches.  Straight leg raising
> was positive with pain at 45 degrees bilaterally. [I periodically] ...prescribe[]
> some Lortab 3-4 tablets daily for symptomatic relief....  Based on the degree
> of discomfort that she appears to be in which is more subjective than objective
> unfortunately it seems very reasonable that she is unable to work and I do
> think her condition is probably permanent.

He added: "It's hard for me to comment on her degree of suffering but it seems to be fairly

moderate."  Read in context, Dr. Droege's equivocal statement that plaintiff's discomfort "is more

-28-

subjective than objective" does not support a finding that there are no objective indicators of pain resulting from plaintiff's disc disease.[6]  Moreover, on this and two other occasions (September 15, 2006 and February 21, 2007), Dr. Droege stated his opinion that plaintiff's discogenic pain was disabling.  In singling out Dr. Droege's statement that plaintiff's pain is "more subjective than objective," Dr. Morris' second key point is not supported by a fair reading of Dr. Droege's reports.

Surgery

Point three of Dr. Morris' six points is: "Ms. Ross appears to be a candidate for spinal fusion surgery, yet she had not seen Dr. Lovely in over one year.  In general, if one has truly disabling pain and conservative measures are ineffective, one would opt for surgical treatment."  This speculative "point" implies that the only reason plaintiff would decline surgery would be that her pain was not "truly disabling."  The record does not support this implication.

Medical reports from all three of plaintiff's treating providers establish that plaintiff had legitimate reasons to decline surgery, even if her pain was "truly disabling."  Her neurosurgeon, Dr. Lovely, stated that surgery was "a very large undertaking and should only be done as a last resort"; that while it "has a good chance of helping her in the immediate future, 10, 20 or 30 years down the road it will put increased stress and degenerative changes on the upper lumbar segments, which are not designed to take this"; and that the potential risks included, but were not limited to, "the risks of anesthesia, injury to the nerves with weakness or paralysis, loss of sensation, loss of bowel, bladder and sexual function or feeling, blindness, spinal fluid leak,

---

[6] The record does not disclose whether Dr. Droege had seen the results of the May 10, 2006 discography when he wrote the May 31, 2007 report.

bleeding, infection, failure to improve, increased stress at the adjacent levels, failure to fuse, etc."

Dr. Van Vorst's reports include the following: "She is contemplating surgery but Dr. Lovely has explained to her that it is very involved and in her case she has two bad discs per discogram and will need a multilevel fusion and is a smoker"; "She is a candidate for surgical fusion per neurosurgeon but this is a big undertaking and serious surgery which may or may not be successful"; and "She has been apprehensive about having this surgery as it is extensive and involves multilevel fusion of the lumbar spine with potential for disc problems at levels above the fusion in the future." Dr. Droege, plaintiff's primary care physician noted: "She has a note from Dr. Lovely who recommended consideration for surgery but he did not feel strongly it would help her. She does not want surgery." On this record, plaintiff's decision to delay or decline surgery is not evidence that her pain is not disabling.

Sit/Stand Work Station

The fourth of Dr. Morris' six points is: "In late 2006, Desmond Ebanks, MD reviewed Ms. Ross' record and concluded she could perform sedentary work with a sit/stand work station." On the question of whether plaintiff can work with a sit/stand work station, plaintiff points out on this motion that, based on her restriction of sitting no more than 15 minutes at a time, the sit/stand work station would require her to experience four flexions or extensions of the back per hour. Dr. Van Vorst wrote on November 3, 2006:

> Apparently there continues to be some question whether she can work or not. She is unable to sit, stand or walk[] for any significant period. She is unable to do any activity which involves any repetitive bending or sitting. A detailed description of a work to stand work station was explained to me. She is unable to use a work to stand work station as this involves repetitive bending, standing.

Dr. Van Vorst's position is supported by Dr. Lovely's observation that: "Flexion and extension

both produce a lot of back pain."  On the subject of whether plaintiff could work with a sit/stand

work station, Dr. Morris' conclusion, which is based on the opinion of Dr. Ebanks, a medical

director of defendant who never examined plaintiff, to the exclusion of the opinions of her

treating providers, is unreasonable.

Dr. Benton's IME Report

Dr. Morris' fifth point is that "independent medical examiner Louis Benton, MD

concluded that Ms. Ross could work part time."  Dr. Benton's report is not, however, part of the

administrative record.  It appears that Dr. Morris relied solely on a reference to Dr. Benton's

report in Dr. Van Vorst's April 26, 2007 letter to Cuna Mutual Insurance.  Dr. Van Vorst wrote:

> [Dr. Benton's] history taking and examination appears to be accurate but he
> then goes on to state that this patient can work 4 hrs per day 5 per week with
> breaks from sitting. I do not agree with this assessment. This is purely his
> subjective opinion and not supported by the facts. It is my opinion that she is
> totally disabled from her previous job.

Dr. Benton's report (which plaintiff submits on this motion) recognizes that plaintiff has

degenerative disc disease and states: "The objective material that I have noted above does give

objective verification of the claimant's complaint of low back pain."  Dr. Benton provides no

explanation for how he reached the conclusion that plaintiff could work part-time as opposed to

being totally disabled or, for that matter, able to work full-time.  In the absence of Dr. Benton's

report, Dr. Morris could not evaluate the basis for Dr. Benton's conclusion that plaintiff could

work part time.  Nor could Dr. Morris evaluate Dr. Van Vorst's statement that Dr. Benton's

opinion "was not supported by the facts."  Under these circumstances, Dr. Benton's opinion does

not support the conclusion that plaintiff was not disabled from work.

Surveillance Video

-31-

Dr. Morris' sixth point is: "Video surveillance from September 2006 demonstrated functionality completely inconsistent with Ms. Ross' claims of impairment."  Dr. Morris' summary of the CD, which appears to have been based on Dr. Ebanks' report, is as follows:

> Ms. Ross was placed under video surveillance from 09-26-06 through 09-30-06. Ms. Ross demonstrated the ability to easily change positions between sitting, squatting, crouching, standing, and walking, all without apparent discomfort. She was able to lift a small child, a small dog, and small parcels. Ms. Ross' stance and gait were normal without evidence of a limp. Her movements were fluid and without hesitation. She did not appear to exhibit any low back stiffness or discomfort. Overall, the quality of her movements was inconsistent with those typical of someone with unrelenting, disabling low back pain. In fact, the video surveillance suggested that Ms. Ross was able to perform more activities than advised by her treatment providers, particularly alternating between sitting and standing.

On July 19, 2007, Dr. Van Vorst wrote to plaintiff's attorney on this subject:

> The CD is taken during a time period in which Mrs. Ross was not being treated by myself and was obvious[ly] not acute at the time as she does not appear to be having difficulty with any of the above activities.  As mentioned in my reports and a recent narrative, I have treated Ms. Ross at times when she was acute with discogenic back pain. I have advised her in the past of proper ways to lift and to avoid sitting for long periods, avoid lifting heavy items from the floor level but have encouraged her to try and live a 'normal' active life if possible. Patients who suffer from discogenic back pain, clinically confirmed, have periods of severe back pain and at times may not have much pain at all until acute. The CD is of a relatively short period of time and not truly representative, in my opinion, of this patient's life style or functionality over a long duration of time, certainly not during an acute bout of back pain.
>
> The CD does not change my opinion as stated in previous reports

Dr. Morris' observation that plaintiff's activities as seen in the surveillance video are "inconsistent with those typical of someone with unrelenting, disabling low back pain," even if true, is irrelevant.  Nowhere do any of plaintiff's treating health care practitioners refer to her pain as "unrelenting."  To the contrary, Dr. Van Vorst's July 19, 2007 letter is consistent with previous

-32-

statements in his notes and letters, including the following: "Most disc patients have periods of less pain and an improved ability to bend and then suffer acute bouts"; "She has some relief for a day or so and the pain comes back"; "As a result of discogenic pain she suffers acute severe bouts of low back pain and is unable to sleep, stand upright or sit when acute."  Plaintiff also points out that the surveillance video recorded her observable activities for a total of 44 minutes during three days out of five days of surveillance.

Likewise, Dr. Morris' observation that plaintiff's gait was "normal without evidence of a limp" does not support his conclusion.  Plaintiff does not claim that her pain interferes with her gait or causes her to limp, nor is there any evidence that, if plaintiff's pain was truly disabling, she would likely display an abnormal gait or a limp.

Dr. Morris does not claim to have viewed the surveillance video; presumably he is relying on Dr. Ebanks' summary.  His analysis of the video is based in part on unsupported assumptions (*i.e.*, that plaintiff claims her pain is "unrelenting" and that if she were in pain she would have a limp) and makes no effort to address Dr. Van Vorst's July 19, 2007 letter.  Under these circumstances, his conclusion that the video demonstrates "functionality completely inconsistent with Ms. Ross' claims of impairment" is not based on a reasonable analysis of the record.

Summary

Dr. Morris' report summarizes the record and acknowledges that plaintiff has "objective findings by discogram and MRI scan," but concludes that plaintiff's condition does not cause disabling pain.  In support of this conclusion, Dr. Morris cited to a statement in an IME report that was not in the record; statements by defendant's medical director, who never examined plaintiff; and a single statement that plaintiff's pain is "subjective," made by a treating physician who also

repeatedly stated his opinion that plaintiff was disabled from work.  Dr. Morris concluded that plaintiff could work at a sit/stand work station, without addressing the statement by her treating chiropractor that she could not do so and the statement by her neurosurgeon that "flexion and extension produce a lot of back pain."  He cited plaintiff's failure to undergo surgery without acknowledging her treating neurosurgeon's reservations about whether surgery was advisable in her case.  And, without viewing the video or addressing Dr. Van Voorst's letter of July 19, 2007 and the other medical evidence, Dr. Morris drew conclusions from the surveillance video that were not based on a reasonable analysis of the evidence.  Indeed, although Dr. Morris summarizes all the evidence, his analysis (comprising the six "key points" plus the paragraph regarding the video surveillance) ignores most of the evidence that supports plaintiff's disability claim, including the evidence from her three treating providers that she suffers substantial pain, and from two of the three that her pain is disabling (the third, the neurosurgeon Dr. Lovely, took no position regarding disability).  Dr. Morris' report does not reflect a reasonable, balanced analysis of the record.

**The VCRC Decision**

The VCRC's October 1, 2007 decision acknowledges that plaintiff has degenerative disc disease with annular tears and has tried various forms of treatment without significant improvement.  In upholding the denial of benefits, the decision states that the surveillance video "revealed that Ms. Ross was able to easily change positions between sitting, squatting, crouching, standing and walking without apparent discomfort."  Regarding Dr. Van Vorst's medical evidence, it states: "Although Dr. Van Vorst mentioned muscle spasm, decreased range of motion and pain, there were no specifics regarding range of motion. Additionally, no information was

-34-

provided regarding prescribed medications, such as pain medications, anti-inflammatory medications, or medications for muscle spasms."  The decision further states: "Previous medical reviews by the MetLife Nurse Consultant and Medical Director [Dr. Ebanks] dated October 10, 2006 and November 5, 2006 concluded that Ms. Ross did have work capacity. No additional information was provided that documented a change in Ms. Ross' condition; therefore, her request for a Disability Pension was denied by the Verizon Disability Processing Unit."  And last, the VCRC decision states that Dr. Morris reviewed the file and that "he opines that Ms. Ross meets the 'any job' standard of the Plan and, therefore, is not disabled as per the definition under the Plan."

Surveillance Video

On the subject of the surveillance video, the VCRC appears to have relied on the initial report by the Disability Processing Unit.  The VCRC did not view the video, nor did it discuss the relevant medical evidence, including Dr. Van Vorst's July 19, 2007 letter.  As with Dr. Morris' report, the Court finds that the VCRC's conclusion regarding the surveillance video is not based on a reasonable analysis of the record.

Range of Motion

As for Dr. Van Vorst's numerous physical findings and his consistent, repeated statements that plaintiff's disc disease causes her disabling pain, the VCRC stated only: "Although Dr. Van Vorst mentioned muscle spasm, decreased range of motion and pain, there were no specifics regarding range of motion."  The medical record shows that all three of plaintiff's treating providers noted decreased range of motion.  On September 8, 2005, Dr. Green noted "decreased ROM in all planes"; on June 15, 2006, Dr. Lovely wrote that plaintiff is "markedly limited with

range of motion"; and on July 12, 2006, Dr. Van Vorst noted "severely decreased ROM in all planes." The VCRC did not explain why further "specifics regarding range of motion" were necessary or why their absence was significant in view of the numerous physical findings, including decreased range of motion, repeatedly recorded by plaintiff's treating health care providers. In the face of all the medical evidence, the lack of "specifics regarding range of motion" does not support denial of plaintiff's claim.

Medications

The VCRC also stated, regarding the Disability Processing Unit's Initial Review: "Additionally, no information was provided regarding prescribed medications, such as pain medications, anti-inflammatory medications, or medications for muscle spasms." On the appeal to the VCRC, plaintiff submitted pharmacy expense summaries showing that she had filled prescriptions for hydrocodone, a narcotic pain medication, written by Dr. Droege in January 2006, September 2006, February 2007, March 2007, and April 2007, and by Dr. Lovely in June 2006. The VCRC also had before it the following: a report by Dr. Green dated September 13, 2005 stating: "NSAIDS [non-steroidal anti-inflammatory drugs] of no help"; September 15, 2006 office notes from Dr. Droege stating: "Suggested continued chronic pain med use, not any evidence of overuse or abuse of her narcotics.... I also recommended trial of amitriptyline [a tricyclic antidepressant sometimes prescribed for chronic pain] 10-30 mg at night to see if augments the Lortab [a brand name for hydrocodone] and may actually help her use less"; November 21, 2006 office notes of Dr. Droege stating that he has been prescribing Lortab 2-3 times daily for pain, and amitriptyline to help with "insomnia due to pain"; a report by Dr. Droege dated May 31, 2007 stating: "Treatments that I am doing is periodically prescribing some Lortab

-36-

3-4 tablets daily for symptomatic relief along with stretching and working with her chiropractor";

Dr. Lovely's March 16, 2006 report that he had prescribed Flexeril, a muscle relaxant; and Dr.

Lovely's June 15, 2006 report that he had prescribed Lortab.  Beyond simply acknowledging their

receipt, the VCRC made no mention of these records.  Nor did the VCRC give any indication that

it had reconsidered its statement, based on the Initial Review, that "no information was provided

regarding prescribed medications."  The VCRC's treatment of this issue is contrary to the

evidence.

Medical Reviews by Nurse Consultant and Dr. Ebanks

The VCRC wrote: "Previous medical reviews by the MetLife Nurse Consultant and

Medical Director [Dr. Ebanks] dated October 10, 2006 and November 5, 2006 concluded that Ms.

Ross did have work capacity.  No additional information was provided that documented a change

in Ms. Ross' condition; therefore, her request for a Disability Pension was denied by the Verizon

Disability Processing Unit."  It thus appears that, rather than considering these reports in

combination with all the other evidence, the VCRC arbitrarily accorded them excessive weight by

treating them as definitive proof that plaintiff's condition was not disabling, and then requiring

plaintiff to prove a change in her condition in order to prove disability.

Moreover, it is significant that neither the nurse consultant's report nor Dr. Ebanks' report

was based on a physical examination of plaintiff.  The Court is aware that an insurer is not

required to obtain an IME in every case and may properly rely on a medical records review in

evaluating a disability claim. *See generally Hobson*, 574 F.3d at 91.  In this case, however, it is

undisputed that plaintiff has disc disease, which can cause severe pain in some cases and little or

no significant pain in others.  Under the circumstances, the VCRC's dismissive treatment of the

-37-

opinions of plaintiff's treating health care providers, and its reliance on the opinions of health care professionals who never examined plaintiff is unreasonable.  The conclusions of the nurse consultant and Dr. Ebanks provide little support for the VCRC decision.

Dr. Morris' Report

And finally, the VCRC relies on Dr. Morris' conclusion that plaintiff "meets the 'any job' standard of the Plan and, therefore, is not disabled as per the definition under the Plan."  As discussed above, Dr. Morris' report does not reflect a reasonable, balanced analysis of the record.

Summary

To conclude, the Court has examined every point on which defendant relies and finds that defendant's determination to deny benefits is not supported by substantial evidence.  Plaintiff has presented ample evidence from her treating health care providers that her condition causes pain that renders her totally disabled under the terms of the Pension Plan.  There is no evidence of comparable quality supporting a contrary finding.  Rather, defendant relies heavily on statements from health care professionals who never examined plaintiff, seizes on random references in the record to support claim denial, and ignores medical evidence that supports plaintiff's claim.  As such, defendant's determination does not reflect "a principled and deliberative reasoning process."  *Glenn*, 461 F.3d at 674.  In addition, defendant's conflict of interest and its failure to reconcile its decision with that of the SSA weigh against defendant's determination, albeit lightly. On review of the entire administrative record, and applying the deferential standard of review, the Court concludes that the denial of benefits is arbitrary and capricious and cannot be sustained. On this record, there is no genuine issue of material fact, and plaintiff is entitled to summary judgment.

-38-

**CONCLUSION**

It is therefore

ORDERED that plaintiff's motion (Dkt. No. 19) for summary judgment is granted; and it is further

ORDERED that defendant's cross motion (Dkt. No. 24) for summary judgment is denied; and it is further

ORDERED that defendant is directed to approve plaintiff's application and pay retroactive benefits under the Verizon Pension Plan for New York and New England Associates; and it is further:

ORDERED that the Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

Date:   September 27, 2011
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-39-